# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAPITAL AREA IMMIGRANTS' RIGHTS COALITION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | Civil Action No. 1:19-cv-02117-TJK |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

ARGUMENT ....................................................................................................................... 7

I.    This Court Has Jurisdiction. .................................................................................... 7

II.   Plaintiffs' Claims Are Likely To Succeed On The Merits. ....................................... 9

    A.    The Rule Was Unlawfully Issued Without Notice And Comment Or A 30-Day Delay In Implementation. ............................................. 9

        1.    The good cause exception does not apply........................................ 10

        2.    The foreign affairs exception does not apply.................................. 18

    B.    The Rule Violates 8 U.S.C. § 1158........................................................ 20

    C.    The Rule Is Arbitrary And Capricious..................................................... 24

III.   The Rule Inflicts Irreparable Harm On Plaintiffs. ................................................. 30

    A.    The Individual Plaintiffs Will Be Irreparably Harmed Absent An Injunction. ........................................................................................ 31

    B.    The Organizational Plaintiffs Will Be Irreparably Harmed Absent An Injunction. ............................................................................. 34

IV.   The Public Interest And Balance Of Equities Weigh In Favor Of Injunctive Relief............................................................................................... 36

V.    Nationwide Injunctive Relief Is Appropriate......................................................... 37

CONCLUSION................................................................................................................... 42

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES:**

*Aamer v. Obama,*
 742 F.3d 1023 (D.C. Cir. 2014) ..................................................................................7

*Air All. Houston v. EPA,*
 906 F.3d 1049 (D.C. Cir. 2018) ................................................................................21

*Am. Ass'n of Exporters & Importers-Textile and Apparel Grp. v. United States,*
 751 F.2d 1239 (Fed. Cir. 1985) ................................................................................18

*Am. Bar. Ass'n v. Dep't of Educ.,*
 370 F. Supp. 3d 1 (D.D.C. 2019) ...............................................................................7

*Am Fed'n of Gov't Emps. v. Block,*
 655 F.2d 1153 (D.C. Cir. 1981) ........................................................................11, 36

*Amgen, Inc. v. Smith,*
 357 F.3d 103 (D.C. Cir. 2004) ...................................................................................7

*Apotex, Inc. v. FDA,*
 No. Civ.A. 06-0627, 2006 WL 1030151 (D.D.C. Apr. 19, 2006) ...........................33

*Aracely, R. v. Nielsen,*
 319 F. Supp. 3d 110 (D.D.C. 2018) .........................................................................36

*Arizona v. United States,*
 567 U.S. 387 (2012) .................................................................................................38

*Aziz v. Trump,*
 234 F. Supp. 3d 724 (E.D. Va. 2017) ......................................................................39

*Califano v. Yamasaki,*
 442 U.S. 682 (1979) .................................................................................................37

*California Communities Against Toxics v. EPA,*
 928 F.3d 1041 (D.C. Cir. 2019) ...............................................................................25

*Chaplaincy of Full Gospel Churches v. England,*
 454 F.3d 290 (D.C. Cir. 2006) ...........................................................................31, 32

*Christensen v. Harris Cty.,*
 529 U.S. 576 (2000) ............................................................................................22, 23

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*City of New York v. Permanent Mission of India to United Nations*,
  618 F.3d 172 (2d Cir. 2010)..................................................................................18, 19

*Consarc Corp. v. U.S. Treasury Dep't of Foreign Assets Control*,
  71 F.3d 909 (D.C. Cir. 1995)........................................................................................37

*Doe v. Trump*,
  288 F. Supp. 3d 1045 (W.D. Wash. 2017)..............................................................36

*East Bay Sanctuary Covenant v. Barr*,
  385 F. Supp. 3d 922 (N.D. Cal. 2019) ...................................................... *passim*

*East Bay Sanctuary Covenant v. Barr*,
  No. 19-16487, 2019 WL 3850928 (9th Cir. Aug. 16, 2019) ......................... *passim*

*East Bay Sanctuary Covenant v. Trump*,
  349 F. Supp. 3d 838 (N.D. Cal. 2018) ....................................................................40

*East Bay Sanctuary Covenant v. Trump*,
  909 F.3d 1219 (9th Cir. 2018) .............................................................................19, 38

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016)....................................................................................................29

*Envtl. Def. Fund v. EPA*,
  922 F.3d 446 (D.C. Cir. 2019) ...................................................................................30

*Grijalva v. Ilchert*,
  815 F. Supp. 328 (N.D. Cal. 1993) .........................................................................34

*Harmon v. Thornburgh*,
  878 F.2d 484 (D.C. Cir. 1989)....................................................................................38

*Henson v. Santander Consumer USA Inc.*,
  137 S. Ct. 1718 (2017)....................................................................................................23

*Hoctor v. United States Dep't of Agric.*,
  82 F.3d 165 (7th Cir. 1996) .........................................................................................10

*Humane Soc'y of the U. S. v. Zinke*,
  865 F.3d 585 (D.C. Cir. 2017) ...................................................................................38

*INS v. Cardoza-Fonseca*,
  480 U.S. 421 (1987)...............................................................................................33, 35

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*,
502 U.S. 183 (1991)........................................................................37

*Int'l Bhd. of Teamsters v. Peña*,
17 F.3d 1478 (D.C. Cir. 1994)........................................................18

*Int'l Fabricare Inst. v. EPA*,
972 F.2d 384 (D.C. Cir. 1992).........................................................26

*Int'l Refugee Assistance Project v. Trump*,
241 F. Supp. 3d 539 (D. Md. 2017).................................................39

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*,
407 F.3d 1250 (D.C. Cir. 2005).......................................................10

*Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't*,
19 F. Supp. 3d 491 (D.D.C. 2018)...................................................37

*Jean v. Nelson*,
711 F.2d 1455 (11th Cir. 1983) ..................................................18, 19

*Jifry v. FAA*,
370 F.3d 1174 (D.C. Cir. 2004)...............................................11, 12, 17

*Kirwa v. U.S. Dep't of Def.*,
285 F. Supp. 3d 21 (D.D.C. 2017)...................................................33

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)...............................................35, 36, 37

*Leiva-Perez v. Holder*,
640 F.3d 962 (9th Cir. 2011) .....................................................33, 34

*Lujan v. Defs. Of Wildlife*,
504 U.S. 555 (1992).........................................................................8

*Mack Trucks, Inc. v. EPA*,
682 F.3d 87 (D.C. Cir. 2012) ......................................................11, 17

*Mid-Tex Elec. Coop. v. FERC*,
822 F.2d 1123 (D.C. Cir. 1987)..............................................10, 11, 14

*Mobil Oil Corp. v. U.S. Dep't of Energy*,
728 F.2d 1477 (Temp. Emer. Ct. App. 1983) ................................15

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Morgan Stanley DW, Inc. v. Rothe*,
  150 F. Supp. 2d 67 (D.D.C. 2001) ......................................................................7, 36

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*,
  463 U.S. 29 (1983) .........................................................................24, 27, 30

*N. Mariana Islands v. United States*,
  686 F. Supp. 2d 7 (D.D.C. 2009) ...................................................................36, 37

*N.J. Dep't of Envt'l Protection v. EPA*,
  626 F.2d 1038 (D.C. Cir. 1980) .........................................................................11

*NAACP v. Trump*,
  298 F. Supp. 3d 209 (D.D.C. 2018) ......................................................................38

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
  145 F.3d 1399 (D.C. Cir. 1998) ......................................................................38, 41

*Nat'l Parks Conservation Ass'n. v. Semonite*,
  282 F. Supp. 3d 284 (D.D.C. 2017) ......................................................................30

*Nat'l Venture Capital Ass'n v. Duke*,
  291 F. Supp. 3d 5 (D.D.C. 2017) .........................................................................17

*Nken v. Holder*,
  556 U.S. 418 (2009) .........................................................................36

*North Carolina v. Covington*,
  137 S. Ct. 1624 (2017) .........................................................................39

*O.A. v. Trump*,
  No. CV 18-2718 (RDM), 2019 WL 3536334 (D.D.C. Aug. 2, 2019) ................................9, 39

*Open Communities All. v. Carson*,
  286 F. Supp. 3d 148 (D.D.C. 2017) ...................................................................36, 37

*Orantes-Hernandez v. Meese*,
  685 F. Supp. 1488 (C.D. Cal. 1988) .........................................................................33

*Rajah v. Mukasey*,
  544 F.3d 427 (2d Cir. 2008) .........................................................................18

## TABLE OF AUTHORITIES—Continued

Page(s)

*Serono Labs., Inc. v. Shalala*,
    158 F.3d 1313 (D.C. Cir. 1998) ........................................................................37

*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018) ....................................................................................32

*Sorenson Commc'ns Inc. v. FCC*,
    755 F.3d 702 (D.C. Cir. 2014) ............................................................... *passim*

*Sullivan v. Zebley*,
    493 U.S. 521 (1990) ........................................................................................38

*Tenn. Gas Pipeline Co. v. FERC*,
    969 F.2d 1141 (D.C. Cir. 1992) ............................................................ *passim*

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015), *aff'd by equally divided Court*, 136 S. Ct. 2271
    (2016) ..............................................................................................................38

*United States v. Ross*,
    848 F.3d 1129 (D.C. Cir. 2017) ....................................................................11

*Util. Air Regulatory Grp. v. EPA*,
    573 U.S. 302 (2014) ........................................................................................22

*Util. Solid Waste Activities Grp. v. EPA*,
    236 F.3d 749 (D.C. Cir. 2001) ........................................................................11

*Vulcan Soc'y v. Civil Serv. Comm'n*,
    490 F.2d 387 (2d Cir. 1973) ..........................................................................41

*Yassini v. Crosland*,
    618 F.2d 1356 (9th Cir. 1980) ...............................................................18, 19

**CONSTITUTIONAL PROVISION:**

U.S. Const. art. I, § 8, cl. 4 ....................................................................................38

**STATUTES:**

5 U.S.C. § 553 ..........................................................................................................9

5 U.S.C. § 553(a)(1) ..........................................................................................16, 18

## <u>TABLE OF AUTHORITIES—Continued</u>

**Page(s)**

5 U.S.C. § 553(b)(3)(B) .................................................................10

5 U.S.C. § 706(2) ..........................................................................38

6 U.S.C. § 279(g)(2) ......................................................................30

8 U.S.C. § 1158 .......................................................................20, 23

8 U.S.C. § 1158(a) .....................................................................8, 21

8 U.S.C. § 1158(b) ........................................................................21

8 U.S.C. § 1158(a)(2)(A) .................................................................21

8 U.S.C. § 1158(a)(2)(C) .................................................................32

8 U.S.C. § 1158(a)(2)(E) .................................................................29

8 U.S.C § 1158(b)(2)(A)(vi) ..............................................................22

8 U.S.C. § 1158(b)(2)(C) .........................................................4, 21, 24

8 U.S.C. § 1158(b)(3)(A) .................................................................33

8 U.S.C. § 1158(b)(3)(C) .................................................................30

8 U.S.C. §1158(c)(1)(A) ..................................................................33

8 U.S.C. §1158(c)(1)(B) ..................................................................33

8 U.S.C. §1158(c)(1)(C) ..................................................................33

8 U.S.C. § 1225(b)(1)(B)(iii)(I) ..........................................................31

8 U.S.C. § 1225(b)(1)(B)(iii)(III) .....................................................4, 31

8 U.S.C. § 1225(b)(1)(B)(v) ...............................................................4

8 U.S.C. § 1252 ............................................................................8

8 U.S.C. § 1252(b)(1)(A)(i) ...............................................................5

8 U.S.C. § 1252(e)(3) .....................................................................9

8 U.S.C. § 1427(a) ........................................................................33

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

8 U.S.C. § 1613(b)(1) ...........................................................................................33

28 U.S.C. § 1331 ..............................................................................................8, 9

Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 ...................38

**REGULATIONS:**

*Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829 (July 16, 2019) ........................................................................................ *passim*

*Designating Aliens for Expedited Removal*, 69 Fed. Reg. 48,877 (Aug. 11, 2004) .....................14

*Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air*, 82 Fed. Reg. 4769 (Jan. 17, 2017)................................................14

*Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, As Amended*, 81 Fed. Reg. 5906 (Feb. 4, 2016) ...............................................14

## INTRODUCTION

Last month, this Court denied a motion for a temporary restraining order ("TRO") filed by Plaintiffs Capital Area Immigrants' Rights Coalition ("CAIR Coalition") and Refugee and Immigrant Center for Education and Legal Services, Inc. ("RAICES") on the sole ground that, as organizations, these Plaintiffs had not shown—on "th[e] limited record" before the Court—that they would be irreparably harmed "within the time frame of a TRO."  Tr. of Oral Ruling at 7:4-9:17.  The Court "want[ed] to be clear," however, that it was "not concluding that this rule, if deemed unlawful, would cause no irreparable harm to those asylum applicants subject to it."  *Id.* at 8:25-9:4.  Further, while the Court expressed doubt about some of Plaintiffs' claims, it stated that it found Plaintiffs' procedural challenge to the Rule "a much closer call," in light of the high burden Defendants must satisfy to forgo notice and comment and the "thin" record on which they based their decision to do so.  *Id.* at 11:4-12:10.

In the intervening month, there have been three important developments.  First, both the District Court for the Northern District of California and a panel of the Ninth Circuit have concluded that the Government is unlikely to succeed on the merits of its procedural defense of the Rule.  *See East Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922, 947-951 (N.D. Cal. 2019); *East Bay Sanctuary Covenant v. Barr*, No. 19-16487, 2019 WL 3850928, at *1 (9th Cir. Aug. 16, 2019).  Second, Plaintiffs have amended their complaint to add nine individual asylum-seekers subject to the Rule, all of whom would face "threats of severe violence or death" if removed from this country.  Mem. Op. and Order at 1-2, Dkt. 36.  And, third, the Ninth Circuit has narrowed the scope of the *East Bay* injunction, meaning that the individual Plaintiffs, and thousands more individuals like them, are once again subject to the Rule and under immediate threat of removal to places in which their lives and safety would be gravely threatened.  *East*

*Bay*, 2019 WL 3850928, at *1-2.

In light of these developments, it is appropriate—and vitally important—that this Court issue a preliminary injunction barring enforcement of the Rule. As four judges have now concluded, the Rule is likely unlawful, at minimum because it "did not comply with the Administrative Procedure Act's (APA) notice-and-comment and 30-day grace period requirements." *Id.* at *1. Plaintiffs would suffer irreparable harm if the Rule remains in effect: Unlike at the TRO stage, Plaintiffs include several individual asylum-seekers directly subject to the Rule, and the accompanying declarations further demonstrate that it is a "virtual certainty" that the organizational Plaintiffs would suffer harm to their missions over the much longer timeframe of a preliminary injunction relative to a TRO. Cubas Supp. Decl. ¶ 5; Garza Pareja Supp. Decl. ¶ 4; McBride Decl. ¶ 13. Finally, a nationwide injunction is the only way to afford Plaintiffs full relief, and the only fair or remotely workable remedy. The instant motion should be granted.

## BACKGROUND

The Court is familiar with the background of this case. On July 16, 2019, Defendants issued a rule, without undergoing notice and comment or granting a 30-day grace period before implementation, that denies asylum eligibility to virtually every alien who enters through the southern border of the United States after transiting through a third country, unless the alien first sought and was denied asylum in a third country. *Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33,829 (July 16, 2019) (the "Rule"). On July 17, Plaintiffs CAIR Coalition and RAICES filed suit in this Court and moved for a TRO and a preliminary injunction. Complaint, Dkt. 1; Pls.' Mot. for TRO, Dkt 3. They argued that the Rule is substantively and procedurally unlawful, and that if implemented it would inflict severe and

irreparable harm on the organizations and their clients seeking asylum.

After expedited briefing and a hearing, this Court denied Plaintiffs' TRO motion. Dkt. 28. It concluded that CAIR Coalition and RAICES likely have standing and fall within the zone of interests of the asylum statute. Tr. of Oral Ruling at 4:17-5:8. But it found that, "on th[e] limited record" before it, the evidence was insufficient to determine how many, "if any," of the organizations' clients would be denied asylum and removed from the country "over the next few weeks," which would be "the time frame of a TRO." *Id.* at 7:4-8:10. The Court thus concluded that CAIR Coalition and RAICES "ha[d] not shown on this record that they, as organizations, will be irreparably harmed absent a temporary restraining order," and "den[ied] the TRO on that basis alone." *Id.* at 9:7-17.

The Court "want[ed] to be clear," however, that its ruling was limited to the organizational plaintiffs and the record before it. *Id.* at 9:1-2. The Court stated that it recognized that the effect of the Rule "is far-reaching and significant," and that it was "not concluding that this rule, if deemed unlawful, would cause no irreparable harm to those asylum applicants subject to it." *Id.* at 8:25-9:4. "[B]ut," it added, "the plaintiffs before me here are not asylum seekers affected by this rule." *Id.* at 9:4-5. The Court also noted that, while it had serious doubts about the merits of Plaintiffs' substantive challenge to the Rule, it found plaintiffs' procedural APA claim "a much closer call," given the high standard imposed by Circuit precedent for forgoing notice and comment, and the "thin" record the agency produced in support of its decision to do so. *Id.* at 11:4-12:10. The Court stated that it was "open to further development of the factual record and additional legal argument on these points as we move forward." *Id.* at 12:21-25.

The same day that this Court issued its ruling, the District Court for the Northern District

of California granted a preliminary injunction barring enforcement of the Rule nationwide.  *East Bay*, 385 F. Supp. 3d at 960.  Applying Ninth Circuit precedent, it found that the plaintiffs before it had established irreparable harm.  *Id.* at 957-958.  It also held that the Rule exceeds the Attorney General's authority under 8 U.S.C. § 1158(b)(2)(C), was improperly issued without notice and comment, and is arbitrary and capricious.  *Id.* at 937-957.  The parties to this case agreed to hold in abeyance Plaintiffs' motion for a preliminary injunction for as long as the *East Bay* injunction remained in full effect.  Joint Status Report, Dkt. 30.

On August 6, Plaintiffs filed an Amended Complaint in which they added nine individuals and one pro bono legal services organization, Human Rights First ("HRF"), as plaintiffs, and raised a new count challenging the Rule as arbitrary and capricious.  Am. Compl., Dkt. 31.  Each of the individual Plaintiffs is an "asylum seeker[ ] affected by this rule."  Tr. of Oral Ruling at 9:4-5.  And their claims are illustrative of the grave persecution and violence faced by many subject to the Rule, the difficulty that asylum seekers encounter in obtaining protection in third countries, and the swiftness with which Defendants have denied asylum claims pursuant to the Rule:

- Plaintiff J.M.M. fled El Salvador for Mexico in May 2018 after years of threats, beatings, and sexual abuse from members of the MS-13 gang.  J.M.M. Decl. ¶¶ 3-6, Dkt. 31-3.  MS-13 found J.M.M. in Mexico, however, and once again subjected her to beatings and threats.  Id. ¶ 7.  On July 16, 2019, J.M.M. entered the United States without inspection and sought asylum.  *Id.* ¶¶ 8-9.  Six days later, J.M.M. received a negative determination at her credible fear interview because she was subject to the Rule.  *Id.* ¶¶ 8-9.[1]  On July 30, after the Rule was enjoined*, an immigration judge*

---

[1]  When an asylum seeker is placed in expedited-removal proceedings, an asylum officer interviews the alien to determine whether she has a "credible fear of persecution," which is defined as "a significant possibility . . . that the alien could establish eligibility for asylum."  8 U.S.C. § 1225(b)(1)(B)(v).  An alien who receives a negative credible-fear determination may obtain review of that decision in a hearing before an immigration judge, which must occur "in no case later than 7 days" after the asylum officer's decision.  *Id.* § 1225(b)(1)(B)(iii)(III).  An alien who is found to lack a credible fear of persecution and does not obtain any other relief from removal must be "removed from the United States without further hearing or review."  *Id.*

reversed that negative determination. *Id.* ¶ 9.

- Plaintiff D.L.R. fled Cuba in June 2019 after being persecuted by the Cuban government for her opposition to Communism. D.L.R. Decl. ¶¶ 3-12, Dkt. 31-4. After traveling through Central America, D.L.R. presented at a U.S. port of entry on July 17 and requested asylum. *Id.* ¶¶ 13-14. Four days later, D.L.R. received a negative credible fear determination because she was subject to the Rule. *Id.* ¶ 14. An immigration judge reversed that determination on July 30 after the Rule was enjoined. *Id.*

- Plaintiff Z.B.M. is a national of Angola who was persecuted, kidnapped, and subjected to death threats because she is a Jehovah's Witness and a member of the Bakongo Tribe. Z.B.M. Decl. ¶¶ 1, 5-11, Dkt. 31-5. Z.B.M. fled via Central America and Mexico to the United States, where she was quickly detained upon her arrival on July 16. *Id.* ¶¶ 13-15. On July 21, Z.B.M. received a negative credible-fear determination because of the Rule. *Id.* ¶ 16. An immigration judge reversed that determination on July 26. *Id.* ¶ 17.

- Plaintiff Y.G.C. fled Guatemala because a man whom Y.G.C. believes is a gang member threatened to kill her if she did not agree to be "his woman." Y.G.C. Decl. ¶¶ 3-9, Dkt. 31-6. Y.G.C. entered the United States without inspection on July 16 and was quickly detained by U.S. immigration officials. *Id.* ¶ 10. She received a negative credible-fear determination on July 21 because of the Rule. *Id.* ¶ 11. An immigration judge reversed that determination on July 29. Am. Compl. ¶ 38.

- Plaintiff M.Y.R.B. is a young indigenous woman from Guatemala who fled Guatemala with her four-year-old son to escape extortion from the Barrio 18 gang, and because of discrimination to which she was subjected for being an indigenous woman. M.Y.R.B. Decl. ¶¶ 1-2, 4-14, Dkt. 31-7. In Mexico, M.Y.R.B. continued to be targeted by extortion and violence. *Id.* ¶ 15. She entered the United States without inspection on July 17, and was quickly detained by U.S. immigration officials. *Id.* ¶ 16. On July 23, she received a positive credible-fear determination. *Id.* ¶ 17.

- Plaintiff K.M.V.M. is a citizen of Honduras who left her hometown with her six-year-old daughter after a violent gang moved into her town and threatened her family. K.M.V.M. Decl. ¶¶ 1-2, 4-15, Dkt. 31-8. She did not stop in Guatemala or Mexico because she believed the gang could reach her in either of those countries. *Id.* ¶ 17. K.M.V.M. and her daughter entered the United States on July 17, and received a negative credible-fear determination on July 24 because she was found to be subject to the Rule. *Id.* ¶¶ 18-19. An immigration judge reversed that negative determination after the Rule was enjoined. *Id.* ¶ 20. K.M.V.M. and her daughter remain detained at the South Texas Family Residential center. *Id.* ¶ 21.

- Plaintiffs W.M.R.O. and C.C.R.O. are unaccompanied minors who fled Honduras

---

§ 1252(b)(1)(A)(i). The Rule requires asylum officers to "enter a negative credible fear determination" for any alien subject to the Rule. 84 Fed. Reg. at 33,843.

after two men threatened to kill their family because their older brother is gay. W.M.R.O. Decl. ¶¶ 1, 3-8, Dkt. 31-9; C.C.R.O. Decl. ¶¶ 1, 3-10, Dkt. 31-10. They traveled through Guatemala and Mexico *en route* to the United States. W.M.R.O. Decl. ¶ 8; C.C.R.O. Decl. ¶ 11. W.M.R.O. and C.C.R.O. entered the United States on July 16 without inspection and were quickly detained by U.S. immigration officials, classified as unaccompanied minors, and transferred to the custody of the Office of Refugee Resettlement. W.M.R.O. Decl. ¶¶ 10-11; C.C.R.O. Decl. ¶¶ 13-14; Am. Comp. ¶ 57. Both W.M.R.O. and C.C.R.O. have received documents styled as notices to appear ("NTAs") for removal proceedings, and they intend to apply for asylum. Am. Comp. ¶¶ 58-59.

- Plaintiff N.G.R.L. is an unaccompanied minor who fled Honduras in May 2019 after being raped and threatened by her stepfather. N.G.R.L. Decl. ¶¶ 1, 3-7, Dkt. 31-12. N.G.R.L. remained in Mexico for approximately one month, but did not feel safe there. *Id.* ¶ 8. On July 24, she presented at a port of entry in the United States where she was detained by U.S. immigration officials, classified as an unaccompanied minor, and transferred to the custody of the Office of Refugee Resettlement. *Id.* ¶¶ 9-10; Am. Comp. ¶ 62. N.G.R.L. intends to apply for asylum, and has received a document styled as a NTA. N.G.R.L. Decl. ¶ 11; Am. Compl. ¶ 63.

In short, each of the individual Plaintiffs—like numerous other clients of CAIR Coalition, RAICES, and HRF—fled horrific persecution and violence to seek protection in this country, and would likely be swiftly found ineligible for asylum and placed at risk of removal if the Rule were reinstated.

On August 16, the Ninth Circuit denied in part and granted in part Defendants' motion for a stay pending appeal of the *East Bay* injunction. *East Bay*, 2019 WL 3850928, at *1. The Ninth Circuit concluded that Defendants had "not made the required 'strong showing' that they are likely to succeed on the merits" of Plaintiffs' claim that Defendants failed to comply with the APA's "notice-and-comment and 30-day grace period requirements." *Id.* It therefore denied the motion for stay pending appeal "insofar as the injunction applies within the Ninth Circuit." *Id.* But the court stayed the injunction outside the Ninth Circuit because it found that "the nationwide scope of the injunction is not supported by the record as it stands." *Id.*

As a result of this decision, the Rule is once again in effect outside the Ninth Circuit. And Plaintiffs are once again under grave threat of irreparable harm. Plaintiffs have accordingly

renewed their motion for a preliminary injunction.

## ARGUMENT

A plaintiff seeking preliminary injunctive relief must show "(1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *see Morgan Stanley DW, Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001). Four judges have now properly concluded that the Government is unlikely to prevail in its defense of the Rule. The individual Plaintiffs would suffer irreparable harm if the Rule remains in effect over the course of this litigation—and the expanded record makes clear that the organizational Plaintiffs would, as well. And only a nationwide injunction would redress these harms. Plaintiffs' motion should be granted.

## I. This Court Has Jurisdiction.

As an initial matter, each of the Plaintiffs has standing to challenge the Rule, falls within the statutory zone of interests, and properly invokes this Court's jurisdiction.

This Court has already found that CAIR Coalition and RAICES likely have standing and fall within the zone of interests of the asylum statute. Tr. of Oral Ruling at 4:17-5:8. HRF is properly before this Court for the same reasons: Like the other organizational Plaintiffs, it has submitted a detailed declaration explaining how the Rule will "disrupt [its] day-to-day ability to provide legal representation and other services for recent migrants." *Id.* at 5:3-4; *see* McBride Decl. ¶¶ 5-9, 12-30, 32-34. And it too "'in practice can be expected to police the interests that the statute protects.'" *Am. Bar. Ass'n v. Dep't of Educ.*, 370 F. Supp. 3d 1, 19 (D.D.C. 2019) (quoting *Amgen, Inc. v. Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004)).

The individual Plaintiffs also have standing. "[T]here is ordinarily little question" that a plaintiff has Article III standing if he "is himself an object of the action . . . at issue." *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561-562 (1992). Each of the individual Plaintiffs is an object of the challenged Rule: Each crossed the southern border on or after July 16, 2019, without first applying for asylum in a third country through which they transited *en route* to the United States. J.M.M. Decl. ¶¶ 7-8; D.L.R. Decl. ¶ 13; Z.B.M. Decl. ¶¶ 13-15; Y.C.G. Decl. ¶¶ 9-10; M.Y.R.B. Decl. ¶¶ 15-16; K.M.V.M. Decl. ¶¶ 17-18; W.M.R.O. Decl. ¶¶ 8-10; C.C.R.O. Decl. ¶¶ 11-13; N.G.R.L. Decl. ¶¶ 8-9; *see also* Am. Compl. ¶¶ 1, 13-63. Indeed, most of the Plaintiffs were initially deemed ineligible for asylum because they were found to be subject to the Rule. *See* J.M.M. Decl. ¶ 8; D.L.R. Decl. ¶ 14; Z.B.M. Decl. ¶ 16; Y.C.G. Decl. ¶ 11; K.M.V.M. Decl. ¶ 20; *see also* Am. Compl. ¶¶ 16, 25, 31, 37, 51. The Rule thus inflicts injury in fact, by rendering these individuals ineligible for asylum and subjecting them to a risk of removal to countries in which they face a grave risk of persecution and violence; that injury is directly traceable to the Rule itself; and it would be redressed if the Rule were enjoined. Article III requires nothing more. *Lujan*, 504 U.S. at 560-561.

The individual Plaintiffs also fall within the zone of interests of the asylum statute. By its terms, that statute gives aliens physically present in the United States a right to apply for asylum, and affords them numerous substantive and procedural protections. 8 U.S.C. § 1158(a). Defendants concede that these provisions are "directed at aliens" and that those "applying for asylum" may sue to vindicate their statutory rights. Mem. of Points and Authorities in Opp. to the Mot. for TRO (hereinafter "Opp.") at 15-16, Dkt. 20.

Finally, there is no jurisdictional impediment to this Court's adjudication of the individual Plaintiffs' claims. This Court has federal question jurisdiction under 28 U.S.C.

§ 1331, and Plaintiffs have a cause of action under the APA.  The Government has previously argued that 8 U.S.C. § 1252 bars aliens from challenging a categorical bar on asylum eligibility until the aliens undergo full removal proceedings and appeal a final order of removal.  *See O.A. v. Trump*, No. CV 18-2718 (RDM), 2019 WL 3536334, at *8 (D.D.C. Aug. 2, 2019); Opp. at 10; 16-17.  In *O.A.*, however, the District Court rejected that argument, explaining that "§ 1252 does not divest the Court of jurisdiction" to suits challenging rules restricting asylum eligibility, and detailing at length the numerous reasons why the Government's reading of § 1252 is untenable. *O.A.,* 2019 WL 3536334, at *19; *see id.* at *8-19.  Those reasons apply with equal force here.

In any event, the Government informed this Court last month that, in its view, an alien who "is in expedited removal" and "has those procedures applied to them" "can bring a suit" challenging the rule under 8 U.S.C. § 1252(e)(3). Tr. of TRO Hr'g at 149:16-150:9; *see also id* at 132:1-10.  Plaintiffs do not agree that § 1252(e)(3) provides the sole avenue for them to sue: As the *O.A.* court explained, that statute is limited to "challenges to expedited removal orders and the implementation of the expedited removal provisions that Congress enacted in the" Illegal Immigration Reform and Immigrant Responsibility Act.  *O.A.*, 2019 WL 3536334, at *19.  But, at minimum, Plaintiffs are exactly the type of plaintiffs who the Government acknowledged could properly "bring a suit" in this Court to challenge the Rule.  No matter which jurisdictional route it takes, this Court may therefore adjudicate their claims.

## II.    Plaintiffs' Claims Are Likely To Succeed On The Merits.

### A.    The Rule Was Unlawfully Issued Without Notice And Comment Or A 30-Day Delay In Implementation.

The APA requires agencies to publish notice of any proposed rule in the Federal Register, invite and respond to public comments on that rule, and delay implementation of the rule for not less than 30 days before its effective date.  5 U.S.C. § 553.  These requirements are not mere

technicalities; they constitute the central procedural protections in the APA, "designed to . . . ensure that agency regulations are tested via exposure to diverse public comment," guarantee "fairness to affected parties," and "give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,* 407 F.3d 1250, 1259 (D.C. Cir. 2005). And "public notice and comment . . . gain[s] in importance 'the more expansive the regulatory reach of [agency] rules.'" *Mid-Tex Elec. Coop. v. FERC,* 822 F.2d 1123, 1132 (D.C. Cir. 1987); *see Hoctor v. United States Dep't of Agric.,* 82 F.3d 165, 171 (7th Cir. 1996).

In this case, Defendants forwent notice and comment and the 30-day publication period before issuing the Rule. To justify that shortcut, Defendants invoked two of the APA's narrowly drawn exceptions to its public participation requirements: the good cause exception and the foreign affairs exception. 84 Fed. Reg. at 33,840-42. The District Court in *East Bay* concluded that the Government's invocation of these exceptions was likely unlawful. *East Bay*, 385 F. Supp. 3d at 948-951. And a panel of the Ninth Circuit unanimously rejected Defendants' request to stay that decision pending appeal, finding that they had "not made the required 'strong showing' that they are likely to succeed on the merits of this issue." *East Bay*, 2019 WL 3850928, at *1. Those determinations are correct.

### 1.    The good cause exception does not apply.

The good cause exception exempts rules from notice and comment and the 30-day pre-implementation grace period when an agency "for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B). The D.C. Circuit has repeatedly held that this exception "is to be 'narrowly

construed and only reluctantly countenanced.'" *United States v. Ross*, 848 F.3d 1129, 1132 (D.C. Cir. 2017) (quoting *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004)).  Its use is "limited to emergency situations," *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) (quoting *Am Fed'n of Gov't Emps. v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981)), where "delay would imminently threaten life or physical property," *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014); *see Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (giving examples).

The judicial inquiry into good cause is "meticulous and demanding." *Sorenson*, 755 F.3d at 706 (quoting *N.J. Dep't of Envt'l Protection v. EPA*, 626 F.2d 1038, 1046 (D.C. Cir. 1980). An agency's "legal conclusion of good cause" is reviewed *de novo*. *Id.*  Further, a court must review "the basis for [the agency's] prediction" and "satisfy itself" that the agency's judgment was "reasonable." *Tenn. Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1145 (D.C. Cir. 1992) (internal quotation marks omitted).  That inquiry "is inevitably fact- or context-dependent," *Mid-Tex*, 822 F.2d at 1132, and the D.C. Circuit has not hesitated to reject an agency's invocation of good cause where the agency "[l]ack[ed] record support proving the emergency" it claimed, *Sorenson*, 755 F.3d at 707, or where the agency "provided little factual basis for its belief" that regulated parties would "rush to avoid the mandates of a final rule," *Tenn. Gas Pipeline*, 969 F.2d at 1144-45.

In this case, the Rule's good cause argument proceeds in two steps.  First, the Rule asserts that a delay in implementation would lead to "a surge in migrants hoping to enter the country before the rule becomes effective."  84 Fed. Reg. at 33,841.  Second, the Rule claims that such a surge "would jeopardize the lives and welfare of aliens who surge to the border" and "be destabilizing to the region, as well as to the U.S. immigration system."  *Id.*  Both steps are

necessary to establish the conclusion that notice and comment "would be impracticable and contrary to the public interest." *Id.* But neither can survive the "meticulous and demanding" scrutiny the APA requires. *Sorenson*, 755 F.3d at 706.

*First*, there is virtually no record support for the prediction that publication of the Rule would have led to a "surge in migrants" prior to the rule's effective date. For that prediction to be correct, the following series of assumptions would need to hold true: (1) a large number of foreign nationals in the Northern Triangle would need to quickly become aware of a proposed rule published in the Federal Register; (2) a sizable number of those individuals would need to alter their travel plans and promptly transit to the United States because of the proposed rule; and (3) many of those individuals would need to arrive at the United States during the 30-day pre-publication period or notice-and-comment period and surge across the border. There is no record evidence supporting any of these propositions.

The only record evidence that the Rule itself points to is a newspaper article claiming that the "rollback" of the Administration's policy of "separating parents from their children" led some human smugglers to "tell potential customers that Americans do not jail parents who bring children—and to hurry up before they might start doing it again." AR439; *see* 84 Fed. Reg. at 33,841. This statement is of highly questionable probative value: It is a single, unverified statement in a newspaper article referring in general terms to statements made by unnamed human smugglers. Reliance on this sort of vague hearsay report as a basis for any agency decision—let alone a decision of this enormous magnitude—would be arbitrary and capricious. *See Sorenson*, 755 F.3d at 706 n.3 ("findings and judgments" underlying good cause determination cannot be "arbitrary and capricious"); *cf. Jifry*, 370 F.3d at 1179 (crediting the government's threat assessments based on declaration by the TSA Deputy Administration). But

12

even taken for all it is worth, this article does not support the Government's prediction. It suggests awareness of a policy that was actually *put into effect* for an extended period of time, not merely proposed in the Federal Register. It says only that human smugglers *told* some customers about the policy, not that any migrants altered their travel plans in response to those self-serving exhortations. And it says nothing to suggest that migrants altered their plans with the speed or in the numbers necessary to produce a surge on the southern border.

Defendants' counsel have cited two other newspaper articles to support their prediction of a surge, but they too provide only the most attenuated support. One article observes that many migrants "appear to be informed about the basics" of U.S. immigration law, such as that they may "request asylum" and "are unlikely to remain detained if they travel with a child." AR768. But all that proves is that migrants are aware of some actual U.S. laws—not that they are aware of proposed rules, that they alter their travel plans because of them, or that they are capable of doing so in large numbers in the time before the notice-and-comment or 30-day grace periods close. The other article notes that when Mexico granted "renewable, one-year humanitarian visas to many of the roughly 13,000 Central American migrants who have accumulated at the country's southern border," it experienced an "influx of new arrivals." AR662, 664-665. But that merely shows that a policy of admitting asylum seekers had its intended result for persons already "accumulated at the country's . . . border" over some unspecified timeframe. It does not remotely suggest that a *proposed* policy would cause persons *thousands of miles away* to alter their travel plans *immediately*.

In contrast to these frail scraps of support, it is telling what the record lacks: a single example, from any point in recent (or even distant) American history, when the announcement of a change in immigration policy caused a swift (or even delayed) change in the rate of unlawful

migration. Not one. *See East Bay*, 385 F. Supp. 3d at 951 ("Why is there no objective evidence to link a similar announcement and a spike in border crossings or claims for relief?"). That omission is all the more notable given that the Federal Government collects enormous amounts of data on migrants seeking admission to this country, *see, e.g.*, AR589-634 (statistical report by the Planning, Analysis, & Statistics Division of the Executive Office for Immigration Review), and so would presumably know whether a sizable number of apprehended migrants traveled to this country in response to an expected change in immigration policy. That the Government does not identify such evidence is strong reason to suspect it does not exist.[2]

Indeed, the D.C. Circuit rejected invocation of the good cause exception for remarkably similar reasons in *Tennessee Gas Pipeline*. There, the Federal Energy Regulatory Commission invoked the good cause exception based on a rationale much like the one the Government offers here: It claimed that if it delayed implementation of a new rule restricting pipeline construction, companies would "seek to avoid [the] rule by rushing new construction and replacements," thereby causing "damage to the environment." 969 F.2d at 1145. The court rejected the agency's claim because it "provided little factual basis" to support its prediction of a "rush." *Id.* The court observed that even though the applicable pipeline regulation had "been in effect for

---

[2] The Government claims that it invoked a similar "surge" rationale in connection with prior rules. *See* 84 Fed. Reg. at 33,841. But most of those policies did not involve such a rationale at all, and each of those rules—unlike this one—was justified by direct evidence that substantiated the claimed harm. *See Mid-Tex*, 822 F.2d at 1132 (explaining that the good cause inquiry "is inevitably fact- or context-dependent"); *cf. Designating Aliens for Expedited Removal*, 69 Fed. Reg. 48,877, 48,880 (Aug. 11, 2004) (describing "urgent need to enhance DHS's ability to improve the safety and security of the nation's land borders" in light of recent rescues of "hundreds of aliens in distress" and discovery of "40 aliens who have died in an attempt to enter the U.S."); *Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, As Amended*, 81 Fed. Reg. 5906, 5906-5907 (Feb. 4, 2016) (invoking good cause to address "fraud and security concerns that have developed subsequent to [a prior] rule's publication"); *Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air*, 82 Fed. Reg. 4769, 4770 (Jan. 17, 2017) (stating that "DHS has recently seen a significant increase in attempts by Cuban nationals to illegally enter the United States "through dangerous" means).

some forty years," the agency "cited only one case" in which a pipeline company had engaged in comparable conduct—too "thin [a] reed," the court said, "on which to base a waiver of the APA's important notice and comment requirements." *Id.* Likewise, the court rejected the Commission's claim that its "practical experience" supported its prediction, countering that "if the agency ha[d] . . . a wealth of practical experience," it should not have been "forced to rely on the 'self-evident' need for the interim rule." *Id.* at 1146.[3]

Here, the evidence the agency relies on for its 'surge' is at least as "thin" as the evidence for a 'rush' in *Tennessee Gas Pipeline*. Tr. of Oral Ruling at 11. And the Government's dearth of evidence, after far more than four decades of immigration restrictions, belies its conclusory claim that "experience" supports its prediction of a surge. 84 Fed. Reg. at 33,841; *cf. Sorenson*, 755 F.3d at 707 (explaining that "something more than unsupported assertion is required" to "establish good cause"). Simply put, the Government "[l]acks record support proving the emergency" it claims. *Sorenson*, 755 F.3d at 707.

*Second*, even if the Government had adequate record basis for its hypothesis of a "surge," it would still falter at the second step of its good cause argument: that a surge "would jeopardize the lives and welfare of aliens who surge to the border," "be destabilizing to the region," and "destabiliz[e] . . . the U.S. immigration system." 84 Fed. Reg. at 33,841. Each of these alleged

---

[3] The D.C. Circuit also distinguished *Mobil Oil Corp. v. U.S. Dep't of Energy*, 728 F.2d 1477 (Temp. Emer. Ct. App. 1983). In that case, the Federal Energy Administration invoked the good cause exception for a rule "equaliz[ing] prices charged to different class of customers by oil refiners during the energy crisis of the early 1970s," on the ground that "advance notice of the regulation would lead to regulatory avoidance by way of long-term contracts." *Tenn. Gas Pipeline*, 969 F.2d at 1146. The D.C. Circuit explained that *Mobil Oil Corp.* involved "special circumstances that set it apart from" *Tennessee Gas Pipeline*: "[i]t is well recognized that prices can be changed rapidly to accommodate shifts in regulatory policy," whereas "[c]onstruction and replacement projects . . . are planned well in advance and take time to accomplish." *Id.* The same distinction holds here. There is no evidence that migration rates "change[ ] rapidly to accommodate shifts in [immigration] policy." And fleeing one's home and traveling to the United States is a decision that also takes considerable "time to accomplish." *Id.*

harms is either unsupported by the record or legally insufficient to justify the good cause exception.

The record affirmatively contradicts the claim that barring migrants from seeking asylum in this country—and instead requiring them to remain in Mexico or return to the Northern Triangle—protects migrants' lives and welfare.  Crossing the southern border undoubtedly poses risks to migrants, and several tragic deaths have occurred during or shortly after such crossings. *See, e.g.*, AR684.  But the administrative record makes clear that those risks are dramatically eclipsed by the dangers migrants face in Mexico and the Northern Triangle.  While transiting through Mexico, approximately 68% of migrants are exposed to violence, and almost one-third of refugee and migrant women are sexually assaulted.  AR290, 703.  And the Northern Triangle is undergoing "unprecedented level[s] of violence," with 43.5% of migrants reporting that a relative died of violence in the last two years.  AR290, 293-294.  The Government cannot plausibly claim, and has not seriously attempted to argue, that migrants are safer in Mexico or the Northern Triangle than in the United States, even accounting for the risks inherent in a border crossing.  That is enough to defeat this argument.

The record is similarly bereft of support for the claim that a surge would "be destabilizing to the region."  The Rule itself does not explain how the region would be destabilized by an increase in migration to the United States over a short period of time.  *See* 84 Fed. Reg. at 33,841 (making this statement without explanation).  The Government has never pointed to evidence supporting such a claim.  And it is doubtful that such a nebulous harm could establish good cause in any event, *see Sorenson*, 755 F.3d at 706 (good cause limited to imminent threats to "life or physical property"), particularly given that the APA continues a separate exception for rules "involv[ing] . . . foreign affairs function[s]."  5 U.S.C. § 553(a)(1).

16

That leaves the Government's argument that a surge would "destabiliz[e] . . . the U.S. immigration system." 84 Fed. Reg. at 33,841. We may assume for the sake of argument that a temporary uptick in immigration would impose increased costs on federal agencies responsible for immigration enforcement. *See id.* at 33,839 (claiming that increased immigration consumes "scarce government resources"). But an administrative and fiscal cost of this kind is not sufficient to invoke the good cause exception. The good cause exception, as the D.C. Circuit has repeatedly made clear, is limited to emergencies involving "imminent" threats to "life or physical property." *Sorenson*, 755 F.3d at 706; *Mack Trucks*, 682 F.3d at 93-94; *Jifry*, 370 F.3d at 1179. An "agency's concern for its (or its components') own bottom line," or a felt need to "save the agency resources," is not enough to establish the requisite "emergency." *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 17-18 (D.D.C. 2017); (citing *Sorenson*, 755 F.3d at 706). And if "fiscal calamity" were ever sufficient to invoke good cause—a question the D.C. Circuit has expressly reserved—*Sorenson* made clear that an agency must at minimum be able to establish "when [its program] expected to run out of money, whether [it] would run out of money before a notice-and-comment period could elapse, or whether there [a]re reasonable alternatives available" to forestall the threat. *Sorenson*, 755 F.3d at 707. Defendants have not made any of those showings: They have not attempted to quantify the magnitude of the "surge" they predict, let alone shown (or even claimed) that it would impose such significant costs on the system as to create a fiscal emergency.[4] Defendants have accordingly "failed to demonstrate sufficient cause for setting aside [the APA's] important safeguards." *Tenn. Gas Pipeline*, 969 F.2d at 1146.

---

[4] Notably, Defendants have not claimed that any temporary increase in immigration would harm the life or physical property of third parties. *See* 84 Fed. Reg. at 33,838-40 (describing "anticipated effects of the rule"). And the record contains no evidence that asylum seekers pose any such threat.

2.      *The foreign affairs exception does not apply.*

The foreign affairs exception exempts rules from the APA's procedural requirements where they "involve[ ]" a "foreign affairs function of the United States."  5 U.S.C. § 553(a)(1). An agency may not invoke this exception merely because a rule "implicate[s] foreign affairs." *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980).  "'[I]mmigration matters typically implicate foreign affairs' at least to some extent," and Congress plainly did not intend to "eliminate[ ] public participation in this entire area of administrative law."  *City of New York v. Permanent Mission of India to United Nations,* 618 F.3d 172, 202 (2d Cir. 2010) (quoting *Yassini*, 618 F.3d at 1360 n.4).   Rather, the APA requires that a rule "*involv*[*e*]" a "foreign affairs *function* of the United States."  5 U.S.C. § 553(a)(1) (emphases added).  The "paradigm case" is a rule that carries out a "diplomatic function," such as a rule that regulates the conduct of foreign diplomats or implements a treaty.   *Permanent Mission*, 618 F.3d at 202 (rule concerned "the treatment of foreign missions"); *see Int'l Bhd. of Teamsters v. Peña*, 17 F.3d 1478, 1486 (D.C. Cir. 1994) (rule "did no more than implement an agreement between the United States and Mexico"); *Am. Ass'n of Exporters & Importers-Textile and Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985) (rule entailed exercise of "the President's foreign affairs power").   Some Circuits have held that this exception extends further, to circumstances in which delaying implementation of a rule would "provoke definitely undesirable international consequences," such as prolonging a diplomatic crisis or causing the United States to renege on an international agreement.  *Yassini*, 618 F.2d at 1360 n.4; *see Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008); *Am. Ass'n of Exporters & Importers*, 751 F.2d at 1249.  *Jean v. Nelson*, 711 F.2d 1455, 1477-78 (11th Cir. 1983).   But even under that more generous construction, it is critical that an agency point to evidence in "the record" showing "how immediate *publication* of the Rule, instead of *announcement* of a proposed rule followed

by a thirty-day period of notice and comment, is necessary for negotiations" or some other diplomatic function. *East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1252-1253 (9th Cir. 2018). There must be "evidence of undesirable international consequences that would result *if rulemaking were employed*." *Jean*, 711 F.2d at 1478 (emphasis added).

In this case, Defendants have not met that burden. The Rule plainly falls outside the "paradigm case"; it involves "immigration," not diplomacy or the execution of a treaty. *Permanent Mission*, 618 F.3d at 202. And Defendants have neither identified nor produced record support showing that there would be "definitely undesirable international consequences" if rulemaking procedures were employed.

On the contrary, Defendants' principal argument for invoking the foreign affairs exception is precisely the one courts have long deemed insufficient: They claim that "[t]he flow of aliens across the southern border . . . directly *implicates* the foreign policy and national security interests of the United States" and that the Rule will "strengthen the ability of the United States to address the crisis at the southern border and therefore facilitate the likelihood of success in future negotiations." 84 Fed. Reg. at 33,841-42 (emphasis added). That argument merely claims that the rule "implicate[s] foreign affairs," as every immigration rule does. *Yassini*, 618 F.2d at 1360 n.4. It does not show that *delaying implementation* of the rule would "provoke definitely undesirable international consequences." *Id.*

When Defendants do gesture toward that burden, they fall woefully short. Defendants posit that "negotiations [with other countries] would be disrupted if notice-and-comment procedures" were allowed, because "public participation and comments may impact and potentially harm the goodwill between the United States and Mexico and the Northern Triangle countries." 84 Fed. Reg. at 33,842. But the Rule does not eliminate the right to comment; it

just implements the Rule during the comment period. *See East Bay*, 385 F. Supp. 3d at 949 (noting that "the Rule actually *invites* public comment" (citing 84 Fed. Reg. at 33,830)). Thus, even if allowing individuals to post comments on an administrative docket somehow affected goodwill more than the public debate that always attends immigration issues (a dubious proposition), the Rule does nothing to prevent that outcome.

Defendants also suggest that immediate implementation of the rule would somehow aid "long-term U.S. relations with Mexico and the Northern Triangle countries" by "address[ing] the enormous flow of aliens through these countries to the southern border." 84 Fed. Reg. at 33,842. But the Rule gives no reason why "long-term . . . relations" would be affected if the Rule's implementation were briefly delayed following its announcement. Furthermore, the Government does not explain why Mexico and the Northern Triangle countries would prefer (as opposed to strenuously object to) a U.S. policy of unilaterally turning away large numbers of asylum seekers and leaving them instead on its neighbor's doorstep. Indeed, at oral argument, the Government's counsel made the opposite claim, arguing that the Rule "puts pressure on our . . . international partner[s]" and increases "the onus on those countries." Tr. of TRO Hr'g at 99:19-102:4.

The Rule thus falls far outside even the broadest construction that courts have given the foreign affairs exception. The Government's failure to follow the APA's notice-and-comment and pre-implementation delay requirements was unlawful, and the Rule should be enjoined on that basis. *See East Bay*, 385 F. Supp. 3d at 950-951; *East Bay*, 2019 WL 3850928, at *1.

### B.    The Rule Violates 8 U.S.C. § 1158.

The Rule is also unlawful because it "fundamentally conflicts with the [approach] Congress took in enacting mandatory bars based on a safe option to resettle or pursue other relief in a third country." *East Bay*, 385 F. Supp. 3d at 945.

Section 1158 gives "[a]ny alien who is physical present in the United States" the right to seek asylum. 8 U.S.C. § 1158(a). It then sets forth a list of carefully drawn exceptions to that right, delineating the circumstances in which Congress thought an alien should be ineligible to seek or obtain asylum. *Id.* § 1158(a), (b). After that list, Section 1158 gives the Attorney General the residual power to "establish *additional* limitations and conditions, *consistent with this section*, under which an alien shall be ineligible for asylum." *Id.* § 1158(b)(2)(C) (emphasis added). The Rule at issue here employs that residual authority to override two of the carefully drawn limitations that Congress enacted into law. That renders the Rule unlawful: "[I]t is well established that an agency may not circumvent specific statutory limits on its actions by relying on separate, general rulemaking authority." *Air All. Houston v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018). In support of this argument, Plaintiffs hereby incorporate by reference the following pages from their TRO briefs: Mem. in Support of Pls.' Mot. for TRO (hereinafter "Pls.' TRO Br.") at 6-17, Dkt. 3-1; Reply in Support of Pls.' Mot. for TRO (hereinafter "Pls.' TRO Reply") at 8-16, Dkt. 22.

A few additional points. At the TRO hearing, Defendants characterized Plaintiffs' position as a form of preemption. They said that Plaintiffs' argument "rests on . . . this idea that" the safe-third-country provision and firm-resettlement bar "occupy the field of anything about a relationship" with another country. Tr. of TRO Hr'g at 58:3-13; *see* Tr. of Oral Ruling at 10 (tentatively accepting that characterization). That is inaccurate. The theory is not that Congress has preempted a category of Executive action; it is that the Executive cannot use a residual authority to override the limits Congress has placed on exceptions to asylum eligibility. In other words, Plaintiffs' argument rests not on preemption but on the elementary principle that "[w]hen a statute limits a thing to be done in a particular mode, it includes a negative of any other mode."

*Christensen v. Harris Cty.*, 529 U.S. 576, 583 (2000).  The Rule clearly violates that principle for three reasons.

*First*, the Rule is the product of effectively striking out language from the text of the provisions that Congress actually enacted.  The Rule takes a red pen to the limited safe-third-country and firm-resettlement exceptions, replacing the limits Congress imposed with far broader limits that Defendants prefer.  Pls.' TRO Br. at 9-12.  The Rule has effectively rewritten Section 1158(a)(2)(A) to read:

> Paragraph (1) shall not apply to an alien if the Attorney General determines that the alien may be removed~~, pursuant to a bilateral or multilateral agreement,~~ to a country ~~(other than the country of the alien's nationality or, in the case of an alien having no nationality, the country of the alien's last habitual residence) in which the alien's life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and~~ where the alien <u>was present and</u> would have access to a ~~full and fair~~ procedure for determining a claim to asylum ~~or equivalent temporary protection, unless the Attorney General finds that it is in the public interest for the alien to receive asylum in the United States.~~

And the Rule has rewritten Section 1158(b)(2)(A)(vi) to read:

> Paragraph (1) shall not apply to an alien if the Attorney General determines that . . . the alien was ~~firmly resettled~~ in another country prior to arriving in the United States.

Defendants cannot "rewrite clear statutory terms" in this manner.  *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014).[5]

*Second*, the Rule leaves both the safe-third-country and firm-resettlement provisions with no real work to do.  Practically speaking, any alien subject to the Rule will necessarily be subject to the firm resettlement bar or the safe-third-country provision.  The Rule thus renders those

---

[5] Defendants argued at the TRO hearing that the addition of the phrase "was present" is significant, and shows that the Rule is addressed to a "different situation" than the safe-third-country provision.  Tr. of TRO Hr'g at 59-60, 69.  That is incorrect.  *Any* alien who is seeking asylum in this country who has crossed the southern border and has forgone some opportunity to seek asylum—that is, any alien subject to the Rule—has *necessarily* been "present" in another country where she could have sought asylum: Mexico.

statutory provisions superfluous. Worse than that, it expands them in a manner that overthrows congressionally drawn limits: The firm resettlement bar requires a certain quality and duration of contact with another country, and the safe-third-country provision requires, as the name would imply, that the alternative forum for asylum be *safe*. The Rule disregards those requirements. "While the firm resettlement bar requires a determination regarding each alien's individual circumstances, and the safe third country bar requires a formalized determination as to the individual country under consideration, the Rule ignores an applicant's individual circumstances and categorically deems most of the world a 'safe option' without considering—or, as set forth below, in contravention of—the evidence in its own record." *East Bay*, 385 F. Supp. 3d at 944.

*Third*, the Rule countermands the balance that Congress struck in the safe-third-country and firm-resettlement provisions. Those provisions balance competing interests. One interest is to relieve burdens on the asylum system by requiring aliens to apply or resettle elsewhere. But another, equally important interest is confirming that the third country is in fact safe and has a fair asylum process, and that the alien is in fact "firmly resettled in" rather than merely transiting through that other country. By striking an appropriate balance, these provisions assure that asylum law can continue to fulfill its humanitarian purposes and the United States' international obligations. When Congress strikes a particular balance in this way, it is not for the Executive to restrike the balance. Again, "[w]hen a statute limits a thing to be done in a particular mode, it includes a negative of any other mode." *Christensen*, 529 U.S. at 583 (internal quotation marks and citation omitted); *see Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017) ("Legislation is, after all, the art of compromise, the limitations expressed in statutory terms often the price of passage").

That principle is especially apt for a statute that explicitly requires any regulation to be "consistent with" the statutory scheme as a whole.  8 U.S.C. § 1158(b)(2)(C).  To this day, Defendants have not provided a persuasive explanation of what work the words "consistent with" are doing in the statute.  When pressed at oral argument to identify something that would not be "consistent with" Section 1158, the best they could come up with was a regulation that allowed for asylum applications up to 18 months after entering the United States, even though the statute requires applications within a year.  Tr. of TRO Hr'g at 60-61.  The problem with that example is that it is already covered by the requirement that any new "limitation" on asylum eligibility be "*additional*."  *Id*. (emphasis added).  In other words, the Attorney General is only authorized to promulgate "additional limitations," and to vitiate an already-existing limitation is not to impose an "additional" one.  So, Defendants still have not identified any work that "consistent with" is doing in the statute.

In short, the Rule countermands both the safe-third-country provision and the firm-resettlement bar, and should be set aside as unlawful for that reason, as well.[6]

C.    **The Rule Is Arbitrary And Capricious.**

As the District Court found in *East Bay*, the Rule is also arbitrary and capricious: It is premised on conclusions that are contradicted by the record and entirely neglects a crucial aspect of the problem it purports to address.  It therefore violates the APA and must be set aside for that reason too.  *East Bay*, 385 F. Supp. 3d at 951-957.

The APA requires an agency, when issuing rules and regulations, to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n. of United*

---

[6] The Rule also violates the TVPRA. Plaintiffs hereby incorporate by reference the following portions of their prior briefs: Pls.' TRO Br. 16-17; Pls.' TRO Reply 16.

*States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted).  Agency action is arbitrary and capricious under the APA—and therefore must be set aside—if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*; *see also California Communities Against Toxics v. EPA*, 928 F.3d 1041, 1056-57 (D.C. Cir. 2019).  The Rule fails this standard.

1.  The Rule is built on the premise that individuals who transit through third countries but do not seek asylum there generally lack meritorious asylum claims.  *See* 84 Fed. Reg. at 33,839.  According to the Rule, choosing "not to seek protection at the earliest possible opportunity" signals a lack of an "urgent or genuine need for asylum." *Id.* at 33,831, 33,839.  But "the government cites nothing in the administrative record to support the inference." *East Bay*, 385 F. Supp. 3d at 946.  In fact, the record tells a very different story:  Migrants do not seek asylum in Mexico because remaining in Mexico may expose those migrants to the very dangers they are attempting to flee. *Id.* at 947.

The record is replete with reports, articles, and studies cataloguing the dangers migrants face in Mexico.  Migrants travelling through Mexico "are often easy prey" for gangs—one of the very menaces many Northern Triangle migrants are fleeing.  AR292.  Violence towards migrants is disturbingly high:  "68.3 percent of the migrant and refugee populations entering Mexico reported being victims of violence during their transit toward the United States."  AR290; *see also* AR703 (similar).  Migrant women, in particular, are targets.  "[A]lmost one third of refugee and migrant women ha[ve] been sexually assaulted" while travelling across Mexico.  AR703.  Other "women and girls have been trafficked to Mexico's southern border where they have been

exploited in bars and night clubs that cater to police, military, and other forces." AR703. This last point—terror by state forces—is repeatedly mentioned by the record. *See* AR290 (report noting that migrants had been victimized by "members of the Mexican security forces responsible for their protection."); AR292 ("Torture is inflicted by governmental security actors."); AR775 (noting that migrants "suffer violence and other abuses at the hands of . . . corrupt migration authorities."). In short, "refugees and migrants face acute risks of kidnapping, disappearance, sexual assault, trafficking, and other grave harms in Mexico." AR703.

Migrants are often targeted over the very traits for which they seek asylum: "their race, nationality, gender, sexual orientation, [and] gender identity." AR703. In particular, LGBTQ and indigenous peoples "face consistent persecution in Mexico and are often forced to seek protection outside of the country." AR703. The record explains that "[t]he Inter-American Commission on Human Rights, an arm of the Organization of American States, has spoken out against the high rates of violence against L.G.B.T. people in Central American countries and Mexico and has noted that the crimes against them are often committed with impunity." AR759.

The Rule wholly fails to grapple with these facts, and instead offers the conclusory statement that a person who travels through another country, but did not seek asylum there, likely has a meritless asylum claim. But "[a] conclusory statement, of course, does not in itself provide the 'satisfactory explanation' required in rulemaking." *Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 392 (D.C. Cir. 1992) (citation omitted).

2. The Rule is arbitrary and capricious in a second way: It asserts that a migrant crossing Mexico or Guatemala—two countries that anyone travelling on the ground from the Northern Triangle to the United States must traverse—"could have obtained protection" there. 84 Fed. Reg. at 33,831; *see also id.* at 88,839 (claiming that migrants cross "multiple countries in which

they may seek humanitarian protection."). But it offers *no* evidence-based explanation for why that is the case.

Turning first to Mexico, the Rule claims that Mexico has a "functioning asylum system" because it is a party to the Refugee Convention and the Refugee Protocol, and because "Mexico has expanded its capacity to adjudicate asylum claims in recent years." 84 Fed. Reg. at 33,838, 33,839. But the fact that Mexico has signed the Convention and Protocol is not itself evidence of a functioning asylum system. *East Bay*, 385 F. Supp. 3d at 952. And the record evidence shows that the Mexican asylum system will not be able to handle the massive influx of new asylum seekers that the Rule will channel to Mexico.

To begin, the Rule's claim that Mexico's asylum system is *currently* "functioning" well, 84 Fed. Reg. at 33,838, "runs counter to the evidence" in the record, *State Farm*, 463 U.S. at 43. The record contains a United Nations High Commission on Refugees report from April 2019 concluding that there is a "lack of information to access the asylum procedure." AR533. Compounding that issue, "75 percent of migrants and asylum seekers . . . were not informed of their right to seek asylum by migration officers in detention facilities." AR703; *see also* AR772 ("Adult and child migrants in need of international protection are not routinely informed about their rights or screened for international protection concerns as is required by Mexican law.").

Worse yet, the record indicates that Mexico is a repeat violator of the non-*refoulement* principle. *See* AR306 ("[T]he non-refoulement principle is systematically violated in Mexico."); AR703 ("Mexican authorities continue to improperly return asylum seekers to their countries of persecution."); AR708 (report from Amnesty International cataloguing instances of *refoulement*). Indeed, the record suggests that the "default process" is for Mexican immigration officials to coerce detained migrants into "signing a number of papers, accepting their 'voluntary return' to

their country and waiving their rights to present legal arguments in their favour within the stipulated 15-day procedural window."  AR717.  Given that U.S. asylum law is "based on the principle of 'non-refoulement,'" this breach alone calls for an explanation.  AR444.

But even if a migrant (1) is told that she can seek asylum and (2) avoids the default process of *refoulement*, the record contains substantial evidence highlighting the procedural issues afflicting Mexico's asylum regime.  Migrants face "an untenable 30-day filing deadline." AR703.  There are "expedited deportation procedures that do not consider individual exposure to violence."  AR306.  Asylum officers routinely rule that "refugees targeted by groups with national reach can safely relocate within their countries."  AR703.  And the system "lack[s] an effective appeal process to correct wrongful denials of protection."  *Id.*

But these shortcomings are only the beginning, because the Rule depends not just on the *current* functioning of Mexico's asylum system but on its capacity to withstand a relatively significant increase in asylum seekers.  The last time Mexico expanded protections to migrants, it was quickly overwhelmed.  AR683; AR688.  And the record contains substantial evidence that the Mexican asylum agency is already at the breaking point.  The agency is "[b]uckling under surging asylum applications and the lowest budget in years."  AR699; *see also* AR700 (head of agency decrying that agency was "overwhelmed" and "simply trying to survive").  It has only four offices (AR703) and a "limited . . . presence in the South" and in other "key locations" (AR534).  Accordingly, "[r]efugee processing in Mexico remains plagued by backlogs and understaffing."  AR703.  Circumstances have grown so dire that the agency has turned to the United Nations for assistance.  AR700.

It is incontrovertible that the Rule would result in a massive uptick in asylum applications in Mexico.  The Rule itself projects that, even independent of the Rule, Mexico in 2019 will

receive more than *five times* as many asylum claims as it did in 2016. 84 Fed. Reg. at 33,839-40.

Meanwhile, "[b]y any reasonable estimation, the Rule anticipates that tens of thousands of

additional asylum claimants—i.e., most of the persons who would otherwise seek asylum in the

United States—will now seek relief in Mexico." *East Bay*, 385 F. Supp. 3d at 952. "The Rule

does not even acknowledge this outcome, much less suggest that Mexico is prepared to

accommodate such a massive increase." *Id*. As the *East Bay* Court aptly summarized:

> [T]he bulk of the administrative record consists of human rights organizations
> documenting in exhaustive detail the ways in which those seeking asylum in Mexico are
> (1) subject to violence and abuse from third parties and government officials, (2) denied
> their rights under Mexican and international law, and (3) wrongly returned to countries
> from which they fled persecution. Yet, even though this mountain of evidence points one
> way, the agencies went the other—*with no explanation*. This flouts "[o]ne of the basic
> procedural requirements of administrative rulemaking," namely "that an agency must
> give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct.
> 2117, 2125 (2016). Its failure to do so here, particularly viewed against the mass of
> contrary evidence, renders the agencies' conclusion regarding the safety and availability
> of asylum in Mexico arbitrary and capricious.

*Id*. at 955-956. And that failure is fatal to the Rule: *Every* alien subject to the Rule must pass

through Mexico, and almost every alien therefore must apply for asylum in Mexico prior to

applying in the United States. *Id.* at 956 & n.25. "[I]f the agencies are wrong about Mexico, the

Rule is wrong about everyone it covers." *Id.* at 956.

That said, at least the Rule and the record paid lip service to Mexico's asylum system.

Besides a passing reference to Guatemala's agreement to the Refugee Convention and the

Refugee Protocol, *see* 84 Fed. Reg. at 33,839, the Rule is wholly silent as to the adequacy of

Guatemala's asylum regime, another country through which many asylum seekers transit *en*

*route* to the United States. The record is tellingly devoid of evidence on this point, besides an

article recounting "concerns over Guatemala's ability to provide shelter and assistance to asylum

seekers crossing into the country from Honduras and El Salvador." AR636-637. The Rule

"offers no sensible explanation at all for that gap in substantiation, nor does it even acknowledge the consequences of its omission." *Envt'l Def. Fund v. EPA*, 922 F.3d 446, 454 (D.C. Cir. 2019). That, too, renders it invalid.

3. Finally, the Rule is arbitrary and capricious because it fails to exempt unaccompanied children, as defined in 6 U.S.C. § 279(g)(2), from its coverage. Congress afforded unaccompanied children special rights under the Immigration and Nationality Act ("INA") and the Trafficking Victims Protection Reauthorization Act ("TVPRA"): Unaccompanied children have the right to present their asylum case first to a USCIS asylum officer in a non-adversarial setting, 8 U.S.C. § 1158(b)(3)(C), and unaccompanied children are exempt from the safe-third-country bar, 8 U.S.C. § 1158(a)(2)(E). These explicit congressional protections make unaccompanied children "an important aspect of the problem" for an agency constricting asylum eligibility to consider. *State Farm*, 463 U.S. at 43. And yet the Rule revokes those protections without an adequate explanation. *See supra* pp. 24-29; *East Bay*, 385 F. Supp. 3d at 956. The Rule thus violates the APA and must be set aside. *See State Farm*, 463 U.S. at 43.

## III. The Rule Inflicts Irreparable Harm On Plaintiffs.

Each of the Plaintiffs also satisfies the second prerequisite for a preliminary injunction: They will "suffer irreparable harm before a decision on the merits can be rendered." *Nat'l Parks Conservation Ass'n. v. Semonite*, 282 F. Supp. 3d 284, 289 (D.D.C. 2017) (internal quotation marks, citation, and emphasis omitted). At the TRO stage, the Court found that two of the organizational Plaintiffs had not shown, "on th[e] limited record" then present, that they would suffer irreparable harm within the two-week "time frame of a TRO." Tr. of Oral Ruling at 7:4-9:10. But things have changed substantially since then. Plaintiffs now include nine individual "asylum seekers affected by this rule," *id.* at 9:5, several of whom are clients of RAICES; the organizational Plaintiffs (which now also include HRF), have submitted supplemental

declarations addressing the factual issues that this Court identified in its TRO ruling; and the lengthened time frame of a preliminary injunction relative to a TRO—from two weeks to as much as two years—eliminates any uncertainty that the organizational and individual Plaintiffs would face irreparable harm during the relevant time period.

A.      **The Individual Plaintiffs Will Be Irreparably Harmed Absent An Injunction.**

There can be no real doubt that the individual Plaintiffs would suffer irreparable harm absent an injunction.  All of the individual Plaintiffs are asylum seekers subject to the Rule. Many of them had the Rule applied against them before it was enjoined, and were issued negative credible-fear determinations—that is, summarily denied asylum—as a result.  *See supra* pp. 4-5.  If the Rule remains in effect outside the Ninth Circuit during the pendency of this litigation, these individuals will once again be categorically denied asylum and subjected to the grave harms that entails.

That risk is "certain and great," and "not theoretical."  *Chaplaincy v. of Full Gospel Churches England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal citation omitted).  The terms of the Rule mandate that individuals subject to its terms (as Plaintiffs indisputably are) be "found ineligible for asylum."  84 Fed. Reg. at 33,843.  And that harm is "imminen[t]."  *Chaplaincy*, 454 F.3d at 297 (internal quotation marks, citation, and emphasis omitted).  As the facts of Plaintiffs' cases illustrate, the entire expedited-removal process—from credible-fear screening to immigration-judge review—frequently takes less than two weeks.  *See supra* pp. 4-5 & n.4; *see also* 8 U.S.C. § 1225(b)(1)(B)(iii)(I), (III) (requiring that immigration judge review credible-fear determination "in no case later than 7 days" after it is rendered, and that aliens found to lack a credible fear be removed "without further hearing or review").  Plaintiffs are therefore at great risk of removal even during the pendency of this Motion.  And in the event that the Government chooses not to use expedited procedures to remove some of those aliens, most of the individual

Plaintiffs have already received notices attempting to initiate full removal proceedings. *See* Am. Compl. ¶¶ 33, 39, 59, 63. Those proceedings are often conducted in a matter of months after such a notice is issued, *see, e.g.*, Cubas Supp. Decl. ¶ 15, Garza Pareja Supp. Decl. ¶ 16, after which time these Plaintiffs would be subject to prompt removal.

In addition, the denial of asylum is an injury "beyond remediation." *Chaplaincy*, 454 F.3d at 297. Removal from this country is inherently a serious and irreparable injury, which carries irreversible practical and legal consequences. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1213 (2018) (describing "'the grave nature of deportation'—a 'drastic measure,' often amounting to lifelong 'banishment or exile'" (citations omitted)); *see also, e.g.*, 8 U.S.C. § 1158(a)(2)(C) (rendering alien ineligible to apply for asylum "if the alien has previously applied for asylum and had such application denied"). For Plaintiffs, removal would also mean return to countries in which they have faced severe persecution, violence, and death threats. *See, e.g.*, J.M.M. Decl. ¶¶ 3-8 (fleeing extortion, beatings, and sexual abuse by gang members in El Salvador); D.L.R. Decl. ¶¶ 3-12 (fleeing government persecution in Cuba, including arrests and assault, due to her opposition to communism); Z.B.M. Decl. ¶¶ 3-11 (fleeing kidnapping, beatings, and death threats by police officers because of her Jehovah's Witness affiliation and tribal membership in Angola); Y.G.C. Decl. ¶¶ 4-6 (fleeing death threats and extortion by a suspected gang member in Guatemala); M.Y.R.B. Decl. ¶¶ 5-12, 15 (fleeing extortion and death threats by gang members and violence due to her indigenous background in Guatemala, as well as extortion, threats, and assault while transiting Mexico); K.M.V.M. Decl. ¶¶ 2-12 (fleeing death threats by gang members in Honduras); C.C.R.O. Decl. ¶¶ 3-9 (child fleeing death threats due to her brother's sexual orientation in Honduras); W.M.R.O. Decl. ¶¶ 3-8 (same); N.G.R.L. Decl. ¶¶ 3-8 (child fleeing threats and rape by her stepfather in Honduras, as well as safety concerns while transiting

Mexico). Asylum officers and immigration judges found all of those risks to constitute a "credible fear of persecution" during the period when the Rule was enjoined. J.M.M. Decl. ¶ 9; D.L.R. Decl. ¶ 14; Z.B.M. Decl. ¶ 17; Y.G.C. Decl. ¶ 11; M.Y.R.B. Decl. ¶ 17; K.M.V.M. Decl. ¶ 20. Courts have found the denial of asylum to constitute an irreparable harm where aliens face such threats. *See, e.g.*, *Leiva-Perez v. Holder*, 640 F.3d 962, 969-970 (9th Cir. 2011); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1504-05 (C.D. Cal. 1988).

It makes no difference that Plaintiffs could still attempt to seek protection under the withholding of removal statute or the Convention Against Torture ("CAT"). As the Rule acknowledges, those statutes impose a "significantly higher" burden for aliens to obtain relief. 84 Fed. Reg. at 33,836-37; *see INS v. Cardoza-Fonseca*, 480 U.S. 421, 431, 440 (1987) (obtaining withholding of removal or CAT protection effectively requires a migrant to demonstrate a 51% chance of persecution or violence, contrasted to showing a 10% chance of such harm for asylum); Am. Compl. ¶¶ 165, 183 (same). Subjecting aliens to a heightened risk of removal and denying them their statutory entitlement to seek asylum are themselves irreparable injuries. *See Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 43-44 (D.D.C. 2017) (finding irreparable injury where government is "blocking access to an existing legal avenue for avoiding removal"); *Apotex, Inc. v. FDA*, No. Civ.A. 06-0627, 2006 WL 1030151, at *17 (D.D.C. Apr. 19, 2006) (loss of "a statutory entitlement" constitutes "a harm that has been recognized as sufficiently irreparable" to merit preliminary injunctive relief). Further, withholding of removal and CAT relief do not confer the same benefits as asylum, including derivative beneficiary status for an alien's spouse and children, work authorization, and eligibility for means-tested public benefits. *See* 84 Fed. Reg. at 33,834; Am. Compl. ¶¶ 94-96, 173 (citing 8 U.S.C. §§ 1158(b)(3)(A), (c)(1)(A)-(C), 1427(a), 1613(b)(1)). Denying an alien

the right to live with her family, work, or receive government assistance are all irreparable harms, as well. *See, e.g.*, *Leiva-Perez*, 640 F.3d at 969-970; *Grijalva v. Ilchert*, 815 F. Supp. 328, 331 (N.D. Cal. 1993).

**B.    The Organizational Plaintiffs Will Be Irreparably Harmed Absent An Injunction.**

The organizational Plaintiffs will also suffer irreparable injury absent an injunction. Plaintiffs have already described the types of injuries the Rule will inflict on these organizations, and hereby incorporate those arguments by reference. Pls.' TRO Br. at 23-26; Pls.' TRO Reply at 20-22. Two critical changes since the TRO stage have also made clear those injuries would be irreparable.

First, Plaintiffs have supplemented the record to remove any doubt that the Rule would drastically reduce the number of clients they can serve. As all of the organizations have explained, their missions include helping as many asylum-seekers as possible to obtain the unique statutory benefits of asylum. Cubas Decl. ¶¶ 4, 8-9, 14, 39 (CAIR Coalition's mission is "to serve as many detained immigrants lawfully seeking asylum as possible"); Cubas Supp. Decl. ¶¶ 3, 4; Garza Pareja Decl. ¶¶ 4, 7-8, 33-37; Garza Pareja Supp. Decl. ¶ 3; McBride Decl. ¶¶ 13, 21, 32. RAICES, CAIR Coalition, and HRF explain that, based on a review of their client-base statistics and their experience since the Rule was implemented, the "vast majority" of their clients are subject to the Rule and fall outside the scope of the limited *East Bay* injunction. Cubas Supp. Decl. ¶¶ 4, 6-7; Garza Pareja Supp. Decl. ¶ 5; McBride Decl. ¶ 21. In light of the increased difficulty of representing these clients in withholding of removal and CAT proceedings, and the associated outlays of resources necessary to adjust to the Rule, CAIR Coalition estimates that it would be "able to serve 50% fewer asylum seekers" while the Rule is in effect, Cubas Supp. Decl. ¶ 19; and RAICES estimates that it would "be able to serve less than

half as many asylum seekers" as they serve today, Garza Pareja Supp. Decl. ¶ 19.  *See also*
McBride Decl. ¶ 17 (due to increased per-case resources under the Rule, HRF "invariably" will
be able to assist fewer clients).

Second, there is no longer any doubt that the Rule will irreparably harm these
organizations' ability to carry out their missions during the "time frame of a[n] [injunction]."  Tr.
of Oral Ruling at 8:9-10.  As noted above, expedited removal proceedings occur—and indeed are
required by statute to occur—in a few weeks.  *See supra* p. 4 n.4.  Many of the organizational
Plaintiffs' clients—including the individual Plaintiffs, several of whom are clients of RAICES—
are placed into such proceedings.  *See, e.g.*, Garza Pareja Decl. ¶ 8; Cubas Decl. ¶¶ 6, 7, 10.  And
despite the organizations' efforts, individuals are dramatically more likely to be removed in these
proceedings if they are ineligible for asylum, given the five-fold increase in a migrant's burden
under the withholding of removal and CAT statutes as compared to the asylum statute.  *See
Cardoza-Fonseca*, 480 U.S. at 431, 440.  While there may have been uncertainty as to whether
removals would occur during the two-week life of a TRO, it is a "virtual certainty" that many of
the organizations' clients will be removed from the country during the months or years in which
a preliminary injunction would be in effect.  Cubas Supp. Decl. ¶ 5; Garza Pareja Supp. Decl.
¶ 4; McBride Decl. ¶ 13.

It follows that the organizational Plaintiffs will suffer irreparable harm absent a
preliminary injunction.  The D.C. Circuit has made clear that an organization suffers irreparable
injury where (1) the challenged policy makes it "more difficult" for the organization to assist
persons whom its primary mission is to help, and (2) the organizations must provide that
assistance to individuals by a particular time, after which " 'there can be no do over and no
redress.' "  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (citation

omitted); *see also Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 177 (D.D.C. 2017).[7]
The Rule will cut roughly in half the number of persons the organizations can help protect from
removal.  And the organizations have at most a few weeks to fulfill their mission of helping any
given individual, after which the individuals will be removed, and "there can be no do over and
no redress."  *League of Women Voters*, 838 F.3d at 9.  In short, the organizations' ability to help
countless individuals will irrevocably pass while this litigation is ongoing.  That is an irreparable
blow to their missions.[8]

## IV.     The Public Interest And Balance Of Equities Weigh In Favor Of Injunctive Relief.

The public interest and the balance of the equities also favor entry of injunctive relief.
There is always "a public interest in preventing aliens from being wrongfully removed,
particularly to countries where they are likely to face substantial harm."  *Nken v. Holder*, 556
U.S. 418, 436 (2009); *see also Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 157 (D.D.C. 2018)
(erroneous denial of eligibility for "conditional parole[ ] constitutes serious potential damage that
merits an injunction").    Furthermore, there is a "substantial public interest in having

---

[7] *See also Morgan Stanley DW, Inc.*, 150 F. Supp. 2d at 77-78 (loss of "customer trust and
goodwill" constituted irreparable harm); *Doe v. Trump*, 288 F. Supp. 3d 1045, 1083 (W.D.
Wash. 2017) (resettlement organizations faced irreparable harm under policy restricting refugee
entry in part because of need to "adequately build programs to service other populations" and
risk that "any sudden shift in the organizations' priorities will threaten their relationships and
goodwill with community partners").

[8] That injury is compounded by the deprivation of an opportunity to provide pre-implementation
comments on the rule.  *See N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 18-19
(D.D.C. 2009) (finding irreparable injury based on loss of opportunity to "influence the Rule's
contents" before it is implemented).  Had they been afforded the opportunity to do so, all of the
organizational Plaintiffs would have provided comments objecting to the rule.  Cubas Decl. ¶ 40;
Garza Pareja Decl. ¶ 38; McBride Decl. ¶ 25.  And the opportunity to provide comments *after*
the rule already went into effect does not cure this injury.  *See Am. Fed'n of Gov't Emps.*, 655
F.2d at 1158  ("Permitting the submission of views after the effective date of a regulation is no
substitute for the right of interested persons to make their views known to the agency in time to
influence the rule making process in a meaningful way" (alteration and citation in original
omitted)).

governmental agencies abide by the federal laws that govern their existence and operations"—including, of course, the APA and its central procedural requirements. *League of Women Voters*, 838 F.3d at 13 (internal quotation marks and citation omitted); *see Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326-27 (D.C. Cir. 1998) (the "public interest balance plainly would weigh in favor of an injunction" where an agency fails to adhere to statutory standards); *N. Mariana Islands*, 686 F. Supp. 2d at 21 (finding public interest in having "administrative agencies comply with their obligations under the APA").

On the other side of the scale, Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Communities All.*, 286 F. Supp. 3d at 179 (internal quotation marks and citation omitted). Furthermore, the central premise of the APA is that ensuring public comment on regulations before they are implemented will improve their quality and the legitimacy—serving, not undermining, the public interest. And the Government's interest in enacting a policy is particularly diminished where, as here, it dramatically departs from the *status quo* in effect for many years. *See Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't,* 319 F. Supp. 3d 491, 498 (D.D.C. 2018) (stating that a preliminary injunction is proper where it will merely "preserve, rather than alter, the status quo—that is, the 'last uncontested status which preceded the pending controversy'" (quoting *Consarc Corp. v. U.S. Treasury Dep't of Foreign Assets Control*, 71 F.3d 909, 913 (D.C. Cir. 1995))).

## V.    Nationwide Injunctive Relief Is Appropriate.

This Court should enjoin the Rule nationwide. As the Supreme Court has made clear, "the scope of injunctive relief" must be "dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). When an Executive Branch policy contravenes a statute, it is invalid and should be enjoined in its entirety. *See, e.g.*, *INS v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 188 (1991) (a regulation that is "without statutory

authority" is "facially invalid"); *Sullivan v. Zebley*, 493 U.S. 521, 536 n.18 (1990); *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409-10 (D.C. Cir. 1998). That rule makes sense: as the D.C. Circuit has explained, "[t]raditional administrative law principles" counsel against the proposition that "named plaintiffs alone should be protected by the injunction." *Harmon v. Thornburgh,* 878 F.2d 484, 495 & n.21 (D.C. Cir. 1989) (upholding nationwide injunction that left agency "free to promulgate new, narrower regulations, subject to the review of the district court"); *cf. Humane Soc'y of the U.S. v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017) ("Normally when an agency clearly violates the APA" a court "vacate[s] its action."). Here, the Rule has no potentially lawful applications under the INA and the APA, and it should be enjoined in full. *See* 5 U.S.C. § 706(2).

A nationwide injunction also is particularly warranted given the immigration context. The Constitution requires a "*uniform* Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4 (emphasis added). And Congress "has instructed that 'the immigration laws of the United States should be enforced vigorously and *uniformly*.'" *Texas v. United States*, 809 F.3d 134, 187-188 (5th Cir. 2015) (quoting Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 115(1), 100 Stat. 3359, 3384 (emphasis added)), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016) (per curiam); *East Bay*, 909 F.3d at 1255-56. A narrower injunction, and particularly one limited geographically, would contravene those commands. Congress' "comprehensive and unified system" of immigration should not be splintered by narrow injunctions that protect only the rights of constricted subsets of migrants located within the issuing jurisdictions. *Arizona v. United States*, 567 U.S. 387, 401 (2012); *see NAACP v. Trump*,

298 F. Supp. 3d 209, 243 (D.D.C. 2018).[9]

Courts fashioning equitable relief also must take into account "what is workable." *North Carolina v. Covington*, 137 S. Ct. 1624, 1625 (2017). The realities of the asylum process—in particular, detention, transfer, and removal procedures—make a geographically limited injunction unworkable here. Upon being apprehended by Defendant CBP, migrants generally are detained for several days in facilities near the southern border, and may be subjected to credible fear interviews there or transferred to detention facilities in a different jurisdiction first. Cubas Supp. Decl. ¶ 14; Garza Pareja Decl. ¶ 14. It is unclear at what stage a geographically limited injunction like the Ninth Circuit's would apply. And the confusion compounds from there: Is a migrant who enters the country through California or Arizona entitled to the benefits of the *East Bay* injunction on an ongoing basis—or does that protection end if she is transferred in detention outside the Ninth Circuit, particularly before she has her CFI? What about if a detained migrant receives a "negative" finding as a result of the Rule during a CFI conducted outside the Ninth Circuit, but later is transferred to a location within the Ninth Circuit—does she then become eligible for a new CFI? What happens if a migrant receives a "positive" credible fear finding while held within the Ninth Circuit, but later is transferred in detention or released

---

[9] The *East Bay* motions panel majority suggests that "granting a more limited injunction" will "allow[ ] other litigants wishing to challenge the Rule to do so." *East Bay*, 2019 WL 3850928, at *3. But a limited injunction is not necessary to allow other litigation to proceed. District courts are capable of issuing parallel—sometimes divergent—decisions on requests for nationwide preliminary injunctive relief. *See id.* at 6 (recognizing that this Court "denied materially identical relief to organizations similar to the Plaintiffs" hours before the *East Bay* nationwide injunction was entered); *see also, e.g.*, *Int'l Refugee Assistance Project v. Trump*, 241 F. Supp. 3d 539 (D. Md. 2017) (granting nationwide temporary restraining order ten days after similar relief was issued by another court); *Aziz v. Trump*, 234 F. Supp. 3d 724 (E.D. Va. 2017) (same). The existence of a standing nationwide injunction might incentivize a litigant to pursue a different procedure, such as an early ruling on summary judgment, but it hardly eliminates the opportunity to obtain a final, appealable determination on the merits in another court. *See O.A.*, 2019 WL 3536334, at *2 (granting plaintiffs' cross-motion for summary judgment regarding a Rule that had already been enjoined nationwide).

into the community for full Section 240 immigration proceedings elsewhere—can the Rule bar her ultimately from being granted asylum?  These sorts of scenarios are quite common given the limited capacity at border detention centers, especially for women and children.[10]  Cubas Supp. Decl. ¶ 17.  And the profound uncertainties that these scenarios would engender are enough to show that a geographically limited injunction would not be workable.  *See* Cubas Supp. Decl. ¶¶ 14-18; Garza Pareja Decl. ¶¶ 14-18; McBride Decl. ¶¶ 27-31.

Moreover, a geographically limited injunction would not be "properly tailored to the alleged harm" suffered by the organizational Plaintiffs.  *East Bay*, 2019 WL 3850928, at *3.  Like the plaintiffs in *East Bay*, the organizational Plaintiffs here serve migrants who enter their service areas from all over the country, either because they have been transferred from a different detention center or have been released at a location other than their point of entry.  CAIR Coalition, for example, serves migrants in the Washington, D.C. area, which has one of the largest asylum offices in the country.  Cubas Supp. Decl. ¶ 6.  Approximately one-third of CAIR Coalition's adult clients entered through the southern border and are applying for asylum, and over 95% of their child clients—about 90% of whom have asylum claims—arrived through the southern border and transited through a "third country" without applying for asylum.  *Id.*.  A geographically limited injunction would thus not necessarily protect CAIR Coalition's clients or the organization itself.  In addition, it is not clear how an injunction limited to the organizational Plaintiffs "would work in practice, for example, whether the clients of the Plaintiff firms would have special rights that other immigrants would not have."  *East Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 866 n.21 (N.D. Cal. 2018).

---

[10] Children are detained by Defendant CBP but often immediately transferred to other shelters or detention centers all over the country.  In the Washington, D.C. area, there are four such shelter programs, which hold about 200 children at a time.  Cubas Supp. Decl. ¶ 17.  About 20-30 of these children typically are girls with babies or who are pregnant.  *Id.*

Finally, as a matter of efficiency, limiting relief to the individual Plaintiffs, the District of Columbia, or some other subset of migrants would be "likely merely to generate a flood of duplicative litigation" by other similarly situated individuals seeking the same relief. *Nat'l Mining*, 145 F.3d at 1409. As Judge Friendly noted, when a regulation is found to be unlawful, it would be "unthinkable" for executive officials to "insist on other actions being brought" over and over again. *See Vulcan Soc'y v. Civil Serv. Comm'n*, 490 F.2d 387, 399 (2d Cir. 1973). Any attempt to fashion a narrower injunction here would create immediate and crippling uncertainty in the immigration system, and should be rejected.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction should be granted.

Dated: August 21, 2019

Manoj Govindaiah
RAICES, INC.
802 Kentucky Ave.
San Antonio, TX 78212
Telephone: (210) 222-0964
Facsimile: (210) 212-4856
manoj.govindaiah@raicestexas.org

*Counsel for Plaintiff Refugee and Immigrant
Center for Education and Legal Services, Inc.*

Adina Appelbaum* (Bar No. 1026331)
CAPITAL AREA IMMIGRANTS'
RIGHTS COALITION
1612 K Street NW, Suite 204
Washington, DC 20006
Telephone: (202) 899-1412
Facsimile: (202) 331-3341
adina@cairoalition.com

* *Motion for admission forthcoming*

*Counsel for Plaintiff Capital Area
Immigrants' Rights Coalition*

Hardy Vieux (Bar No. 474762)
Patricia Stottlemyer (Bar No. 888252536)
HUMAN RIGHTS FIRST
805 15th Street, N.W., Suite 900
Washington, D.C. 20005
Telephone: (202) 547-5692
Facsimile: (202) 553-5999
vieuxh@humanrightsfirst.org
stottlemyerp@humanrightsfirst.org

*Counsel for Plaintiff Human Rights First*

Respectfully submitted,

**HOGAN LOVELLS US LLP**

/s/ Justin W. Bernick

Neal K. Katyal (Bar No. 462071)
T. Clark Weymouth (Bar No. 391833)
Craig A. Hoover (Bar No. 386918)
Justin W. Bernick (Bar No. 988245)
Mitchell P. Reich (Bar No. 1044671)
Elizabeth Hagerty (Bar No. 1022774)
Kaitlin Welborn (Bar No. 88187724)
Heather A. Briggs (Bar No. 241719)
Michael J. West* (Bar No. 1616572)
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com
t.weymouth@hoganlovells.com
craig.hoover@hoganlovells.com
justin.bernick@hoganlovells.com
mitchell.reich@hoganlovells.com
elizabeth.hagerty@hoganlovells.com
kaitlin.welborn@hoganlovells.com
heather.briggs@hoganlovells.com
michael.west@hoganlovells.com

Thomas P. Schmidt
Mohan Warusha Hennadige*
390 Madison Avenue
New York, NY 10017
Facsimile: (212) 918-3100
thomas.schmidt@hoganlovells.com
mohan.warusha-
hennadige@hoganlovells.com

* *Motion for admission pending*

*Counsel for Plaintiffs*